In the Matter of the Probate of the Last Will and Testament of ALPHONSE J. STEPHANI, Deceased.*

FRANKFURTER BANK OF FRANKFORT A. M., GERMANY, Executor, etc., of ALPHONSE J. STEPHANI, Deceased, Proponent, Appellant; SOPHIE E. M. LEITH and MARIA J. M. LAWRENCE, Appellants; CITY BANK FARMERS TRUST COMPANY, KARL STEPHANI, JOHANNES F. STEPHANI, MARIA SASSE and EMMA G. VON GLAUBITZ, Respondents.

Third Department, March 17, 1937.

*Topken & Farley* [*Harry P. Kehoe* and *Philip F. Farley* of counsel], for the proponent, appellant.

*Nicholas A. Donnelly* [*George J. Gillespie, Jr.,* of counsel], for the appellants Leith and Lawrence.

*Charles Irving Oliver,* for the City Bank Farmers Trust Company and others, respondents.

* Revg. 159 Misc. 43.

CRAPSER, J. The will and codicil were dated the 17th day of April, 1919. Objections were filed to the probate of the will and codicil and were withdrawn after the execution and approval by the surrogate of a compromise agreement between the interested parties. The will and codicil were holographic, and no question is raised about the due execution and publication of the same.

The decedent died on February 1, 1935, at the age of about seventy years, and was a patient in the Dannemora State Hospital. The decedent had been convicted in New York county of murder in the second degree; he shot and killed his mother's lawyer in a dispute over his father's estate, and was sentenced to Sing Sing Prison for life. In that trial the defendant was defended by the firm of Howe & Hummel, and a plea of insanity was raised. A commission was appointed to inquire into his sanity, and reported to the court that the decedent was sane, and he was later convicted and sentenced to Sing Sing Prison.

In January of 1903 a prison physician at Sing Sing Prison certified to the warden, pursuant to what is now section 383 of the Correction Law, that the decedent was in his judgment insane, and the decedent was thereupon transferred to the Dannemora State Hospital, where he remained until his death.

The decedent was sane when convicted and his insanity has not been judicially determined notwithstanding the fact that he was transferred pursuant to what is now section 383 of the Correction Law to the Dannemora State Hospital.

The certificate of the physician is not a determination of incompetency, but the decedent was held in the hospital under the sentence for murder in the second degree. (*Trust Company of America* v. *State Safe Deposit Co.*, 109 App. Div. 665; *People ex rel. Stephani* v. *North*, 91 Misc. 616.)

Section 144 of the Surrogate's Court Act requires that before admitting a will to probate the surrogate must be satisfied (a) that the will was duly executed, and (b) that the testator, at the time of executing it, was in all respects competent to make a will, and not under any restraint.

The will was duly executed and the formalities required by section 21 of the Decedent Estate Law were complied with.

It is also satisfactorily shown by the testimony of the subscribing witnesses and by the will itself that at the time of the execution the testator was free from any restraint.

The only question remaining, therefore, is whether, at the time of the execution, the testator was competent to make a will or, in other words, did he have testamentary capacity?

When the will was first offered for probate a preliminary examination of the subscribing witnesses was asked for by the contestants who intended to file objections. An examination was had for the purpose of enabling the next of kin to determine whether they desired to file objections. The witnesses were not cross-examined by the proponents.

In that preliminary examination Dr. Dexter was asked by Mr. Gillespie, one of the attorneys now asking for the probate of the will, this question: " Q. Was Stephani, in your opinion, capable of making a will at that time? * * * A. I think he was mentally incompetent to make a will." The other attesting witness was asked: " Q. Do you believe Stephani had capacity to make a will? A. No, I do not."

After the withdrawal of the objections and the compromise agreement was entered into, the subscribing witnesses were again examined. Dr. Roger Dexter testified in this examination that the testator knew the extent of his property and where it was, knew he was signing his will, and knew what the will contained, knew who were his relatives and who were the natural objects of his bounty, and had sufficiently clear memory to collect in his mind the facts concerning his estate. This witness was later recalled and was examined by the surrogate, who read to him the definition of sound mind and testamentary capacity as set forth in *Delafield* v. *Parish* (25 N. Y. 9) and in *Horn* v. *Pullman* (72 id. 269), and, after reading the definition from these cases, the surrogate asked this question: " In view of those definitions, as set forth in those cases, Doctor, what would you say about the soundness of mind of Mr. Stephani in 1919 with respect to his ability to make a will? In other words, did he have testamentary capacity to make a will as thus defined? A. Yes, I would say he did."

Dr. Dexter, from his testimony, seems to think that Mr. Stephani possessed that element of testamentary capacity which the law required of a man to make a will, although, as a doctor and psychiatrist, he believed Mr. Stephani to be insane. In his examination of June 26, 1935, when he testified that Mr. Stephani was mentally incompetent to make a will, he was not asked in reference to the elements of testamentary capacity, which he was asked on his later examination, and probably had very little idea at that time of what constituted testamentary capacity, but, on his later examination, when the direct questions were asked him to determine whether or not the man had testamentary capacity, and the definition was read to him from leading cases, he had no hesitancy in saying that the testator had testamentary capacity. He finally said that legally he was competent but medically he was not.

The other subscribing witness, Harry L. Dow, when he was later called, testified that the decedent at the time that he made the will knew what property he had and the effect of the will, and that he had testamentary capacity. The surrogate stated to this witness as follows: " The law defines what he must have, he must have testamentary capacity; must know the extent of his property; must know his relatives, sometimes called the object of his bounty, and he must appreciate the nature of the act he is doing; he must know how he is disposing of his property. With that definition, do you now think he had testamentary capacity? A. Yes, I think he had capacity to know what he was doing and all of that."

In addition to this testimony, Dr. Albert L. Hayes, an alienist, was sworn, who said he had been employed at Dannemora State Hospital from 1922 to 1929; that he knew the testator slightly while at the hospital, and discussed with him on one occasion an accounting from his committee; he had read the will and had examamined the letters in evidence, and, based upon his acquaintance with Stephani from 1922 to 1929, he gave it as his opinion that Stephani had testamentary capacity at the time he made the will; that Stephani knew the extent of his property and who his relatives were and who were the natural objects of his bounty, and understood the consequences of making a will, and that by the act he was disinheriting some of his relatives.

Dr. Charles L. Bailey was also sworn by the proponents. He gave his qualifications. He was for a short time helping out at Dannemora State Hospital in 1919, and became acquainted with the testator. He discussed with the testator the extent of his property; that the testator told him how much money he had in different financial institutions, and told him he had made a will before his conviction and a recent will. Dr. Bailey testified that the testator knew what he possessed; that he knew the object of his bounty, and that he knew his relatives. Dr. Bailey had also read the wills of 1890 and of 1919, and he gave it as his opinion that Stephani possessed testamentary capacity at the time of the making of the will. There was no evidence opposed.

The surrogate, in his decision, says: " The proof offered to show testamentary capacity of the decedent is insufficient to satisfy the conscience of this court on that issue, having in mind the fact that the decedent for the last thirty-two years had been confined in the Dannemora State Hospital, where only persons are confined who in the opinion of the physicians of the penal institutions of this State are insane, although they have not been judicially declared insane, pursuant to article 81 (§§ 1356–1384) of the Civil Practice Act. I am of the opinion that the confinement of the decedent in

the Dannemora State Hospital for the period of years above mentioned is of itself sufficient to repudiate the usual presumption of sanity as a *datum* in this case."

As it has been heretofore said, the decedent, when indicted for murder offered a plea of insanity, and a commission was appointed and found him sane. He was convicted, with the pleas of insanity offered in his case by able counsel, and was sentenced to imprisonment for life. He was sane when convicted.

A certificate of a physician is not a determination of incompetency within either the spirit or the letter of the Civil Practice Act or of any law of the State of New York.

" Two classes of persons are confined in Dannemora State Hospital. *First,* a class of convicts detained solely as prisoners, the only warrant for whose detention is the original certificate of conviction; and, *second,* a class of ex-convicts, detained as insane persons, solely under an order of commitment as such, granted by a court or judge at the conclusion of proceedings in lunacy.

" In the case under consideration, the convict belongs to the former class. His sentence was life imprisonment. Within the terms of that sentence he is confined in one of several of the State institutions devoted to the purpose. His punishment is imprisonment. In the place of his imprisonment he has no choice or say." (*People ex rel. Stephani* v. *North,* 91 Misc. 616.)

The proof as to testamentary capacity in this case is uncontradicted; four witnesses testified to it and to the facts constituting it; no witnesses contradicted it. In addition, the will and codicil themselves furnished added proof, if added proof is needed; they are holographic. The testator knew how to make a will. A reading of it shows that he knew the extent and nature of his property and natural objects of his bounty, and what he desired to do with it.

The surrogate seems to have rested his decision upon the fact that the testator had been confined in Dannemora State Hospital for thirty-two years. That fact is not enough in itself, giving it its greatest weight, to overcome the positive testimony of the three doctors, connected at times with the State hospital where he was confined, who knew him. The fact of his confinement, if given its greatest weight, could only be *prima facie* evidence, and the direct evidence in the case was entirely sufficient to warrant the will being probated, there being no evidence opposed to it.

The conditions of section 144 of the Surrogate's Court Act were fully met.

The decree, in so far as appealed from, should be reversed, and the will admitted to probate.

HILL, P. J., McNAMEE, BLISS and HEFFERNAN, JJ., concur.

Decree, in so far as appealed from, reversed on the law and facts, and this court hereby decrees that the will is admitted to probate, with costs to all parties filing briefs or appearing upon the argument, payable out of the estate.